# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>AHMED EL-SHERIF,<br><br>    Defendant. | Case No. 17-20006-01-JAR |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Ahmed El-Sherif was charged in a two-count Indictment with knowingly storing hazardous waste without a permit from March 2012 through October 2013, in violation of 42 U.S.C. § 6928(d)(2)(A), and obstruction of an agency proceeding, in violation of 18 U.S.C. § 1505. This case was tried to the Court beginning on February 1, 2018. This decision represents the Court's findings of fact and conclusions of law. As described more fully below, the Court finds Defendant guilty of Count 1 and not guilty of Count 2.

## I.    Evidentiary Rulings

Before proceeding to the Court's findings of fact, the Court must resolve several evidentiary issues that remain following trial. These include a continuing objection under Federal Rule of Evidence 404(b) to evidence concerning radiation licensure issues that arose before the relevant period in the Indictment, a motion by Defendant in opposition to the testimony of the Government's proposed experts, and testimony of other witnesses regarding radiological testing, an inspection of an attic area at Defendant's business, and tax documents for Beta Chem (Defendant's laboratory). The Court addresses each issue in turn.

**A.  Evidence Regarding Previous Radiological Investigations and Licensure Issues**

The Indictment charges Defendant with a violation of the Resource Conservation and Recovery Act ("RCRA") occurring from March 2012 through October 2013.  At trial, the Government sought to admit evidence regarding issues Defendant had with his Kansas radiation materials license beginning in 2005.  This evidence included testimony and video regarding site visits by the Kansas Department of Health and Environment ("KDHE") made to Defendant's laboratory, letters and orders from the KDHE directed to Defendant, and an application by Defendant for a renewed radioactive materials license.[1]  The Government also presented evidence regarding a prior investigation of Defendant's laboratory under RCRA.[2]  The Court admitted much of this evidence subject to Defendant's continuing objection under Fed. R. Evid. 404(b) and his continuing objection to relevance under Fed. R. Evid. 401 and 402.  The Court now memorializes its rulings on Defendant's continuing objections below.

Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Evidence of prior crimes or other bad acts of a defendant may, however, be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, or knowledge, but the prosecutor must give notice to the defendant before trial of the prosecutor's intent to use this evidence.[3]  Defendant argues that evidence of these earlier radioactive licensing issues constitutes Rule 404(b) evidence, and that this evidence is

---

[1]Exs. 10, 33, 44, 85, 180.

[2]*See* Ex. 87a.

[3]Fed. R. Evid. 404(b).

inadmissible because the Government did not provide notice to Defendant, as required by Rule 404(b).

Rule 404(b) evidence only limits evidence of "'other' crimes—those extrinsic to the charged crime."[4]  The Rule does not limit "intrinsic evidence," that is, "evidence of acts or events that are part of the crime itself, or evidence essential to the context of the crime."[5] Evidence is intrinsic, and thus not subject to Rule 404(b), "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged."[6]

The Court finds that evidence related to KDHE radiological surveys and radiation licensing issues that predate 2012 through 2013 are not subject to the requirements of Rule 404(b).  As explained below, the KDHE performed the initial radiological survey at Beta Chem in 2005, which revealed widespread radiation contamination in the facility.[7]  This set off a series of events regarding Defendant's radiation materials license, including additional radiological surveys at Beta Chem, communications and a consent agreement between the KDHE and Defendant, orders of suspension and revocation, and ultimately the seizure of Beta Chem in 2013 because the radiation contamination had not been remediated.

One of the Government's primary arguments as to why the chemicals at issue in this case were waste is that the chemicals, and/or the containers they were stored in, had long been contaminated.  Thus, evidence beginning in 2005 of the evolution of these radiation

---

[4]*United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009).

[5]*Id.* at 1315; *United States v. Irving*, 665 F.3d 1184, 1212 (10th Cir. 2011) (quoting *Parker*, 553 F.3d at 1314).

[6]*Irving*, 665 F.3d at 1212 (quoting *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993)).

[7]Tr. 397:25–398:11.

contamination issues is "essential to the context of the crime."[8]  Furthermore, as explained

above, the radiation contamination issues that the KDHE identified in 2005 had not been

resolved by the relevant period in the Indictment.  The radiological issues that predate 2012 and

2013 are not a series of separate events that were cut off by remediation of the contamination,

but instead are part of an unbroken chain of events that culminated in the Beta Chem facility

being radiologically contaminated in 2012 and 2013.  Therefore, the Court finds that evidence of

these prior radiological issues is "inextricably intertwined" with evidence that the facility was

contaminated during the relevant period in the Indictment.  Accordingly, the Court overrules

Defendant's continuing Rule 404(b) objection to this evidence.

Defendant also objects to evidence of past radiological contamination issues on relevance

grounds.[9]  For the reasons explained above, the Court finds that this evidence is relevant to the

issue of whether the chemicals at issue in this case were wastes during the relevant period in the

Indictment.  The Court therefore overrules Defendant's continuing objection based on relevance.

Defendant also objected at trial to evidence regarding communications that Kevin

Snowden, a RCRA compliance officer at the United States Environmental Protection Agency

("EPA"), had with Defendant following an inspection of Beta Chem under RCRA in 2005.[10]

Defendant argues that these communications constitute Rule 404(b) evidence, and that they are

inadmissible because the Government did not provide notice as required under Rule 404(b).  The

Court agrees that evidence of Defendant's acts and communications related to the prior RCRA

inspection are subject to Rule 404(b).  The prior RCRA investigation commenced in 2005 and

ended in 2006.  Thus, unlike the prior radiological inspections and investigation, which

---

[8] *Parker*, 553 F.3d at 1315.

[9] *See* Doc. 69-3 (listing exhibits subject to continuing objection under Fed. R. Evid. 401 and 402).

[10] *Id.* at 3–5; Tr. 365:9–12; Ex. 87.

continued throughout the period in the Indictment, the results of the 2005 RCRA investigation and Defendant's acts and communications in relation to this investigation are not intrinsic to the RCRA violation at issue in this case. The Court therefore sustains Defendant's Rule 404(b) objection as it relates to Defendant's communicative acts related to the 2005 RCRA investigation.[11] The Court will, however, consider evidence of communications by the EPA officials to Defendant regarding RCRA.

### B. Motion in Opposition to Proposed Government Experts

Before trial, Defendant filed a motion to limit the testimony of three of the Government's proposed experts: Dr. Richard Helmich, Dr. Edwin Buckner, and Douglas Ferguson.[12] Defendant argued that (1) Dr. Helmich should not be able to testify about whether Defendant followed "good laboratory practices," (2) Dr. Buckner should not be allowed to testify regarding legal standards or elements under RCRA, and (3) Ferguson should not be permitted to testify about how Defendant's failure to properly contain volatile organic materials contaminated by radiation contributed to the significant levels of radiation contamination documented at Beta Chem, or about the challenges the EPA faced in properly disposing of contaminated hazardous waste.[13] The Court initially considered Defendant's motion at a limine hearing on January 12, 2018. The Court granted the motion as it related to Dr. Buckner, and took the remainder under advisement.

At trial, the Court allowed Dr. Helmich to testify over Defendant's continuing objection regarding Defendant's laboratory practices based on photographs Dr. Helmich reviewed, and Dr.

---

[11]Tr. 366:20–367:21 ("I am sustaining that part of the continuing objection to testimony and exhibits to the extent that it has to do with communicative acts or other acts of Mr. Sherif that go to his knowledge and intent of RCRA.").

[12]Doc. 19.

[13]*Id.*

Helmich's opinions regarding whether these were good laboratory practices. After explaining that it was taking the scope of his testimony under advisement, the Court recognized Dr. Helmich as an expert in chemistry, good laboratory practices, and the storage of hazardous chemicals.[14] Dr. Helmich testified specifically to certain laboratory conditions and storage practices he observed in photographs, including chemicals being stored in a fume hood work space, chemical containers being stored on their sides, the use of parafilm—a film similar to Saran wrap—as a lid, and storage of chemical containers in filing cabinets. Dr. Helmich expressed opinions on what he considers good laboratory practices, and how Beta Chem's storage methods failed to comply with these practices.

Having reviewed Dr. Helmich's testimony, the Court finds that his opinion testimony as to whether Defendant generally followed good laboratory practices is not relevant to the RCRA charge in Count 1. Therefore, the Court grants Defendant's motion as it relates to Dr. Helmich's opinion testimony on good laboratory practices. The Court will, however, consider Dr. Helmich's factual testimony and other evidence related to Defendant's storage methods. The manner in which Defendant stored chemicals and chemical containers is relevant to whether the chemicals were stored as waste under RCRA.

Ferguson testified to several issues related to the radiological inspections at Beta Chem and the Superfund[15] removal action in 2014. Specifically, he testified that he performed a radiological survey on September 23, 2005, in which he observed elevated radiological contamination throughout the Beta Chem facility. Ferguson also testified about the cost of the

---

[14]Tr. 983:9–23.

[15]Superfund is an EPA program that performs work under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") and assesses sites for cleanup where a potential exists for hazardous substances to be released into the environment. Tr. 38:16–39:5.

Superfund cleanup and how the EPA disposed of hazardous substances that were contaminated with radiation. Defendant argues that Ferguson's testimony regarding radiation contamination at the Beta Chem facility is not relevant to the RCRA charge. But as explained above, the Court finds that this testimony is relevant to whether the chemicals at issue were hazardous waste during the Indictment period.[16] Furthermore, the Court finds that Ferguson's testimony regarding the challenges the EPA faced in disposing of hazardous chemicals is also relevant, as it reflects the extent to which the facility and chemicals were contaminated with radiation. Accordingly, the Court denies Defendant's motion as it relates to Ferguson.

### C. Testimony and Reports of Michael Lemon

At trial, Defendant moved to strike the testimony of Michael Lemon, a scientist at the University of Kansas who performed radiological testing on chemicals and containers stored at Beta Chem.[17] Defendant also moved to exclude Exhibit 97, a report Lemon prepared of his test results.[18] The Court took these motions under advisement.

Defendant argues that Lemon's testimony and Exhibit 97 are inadmissible because of the "analytical gap" between the end date of the Indictment period in October 2013 and Lemon's performance of the radiological testing in June 2014.[19] Defendant contends that the results of the tests are unreliable because they were obtained eight months after the KDHE seized the Beta Chem facility. In the intervening months, the chemicals remained in a contaminated facility and government officials handled them on several occasions. Thus, Defendant argues it is

---

[16]*See supra* Part I.A.

[17]Tr. 682:4–687:1.

[18]*Id.*; Doc. 69 at 15–17.

[19]Doc. 69 at 16.

impossible to determine whether the chemicals became contaminated during those intervening months or during the earlier Indictment period.

Although the eight-month gap between the seizure of the Beta Chem facility and the performance of the radiological testing affects the weight of Lemon's testimony and Exhibit 97, the Court finds it does not affect the admissibility of the evidence. As explained below, the evidence at trial demonstrated that the Beta Chem facility had long been contaminated by radiation, and there was no evidence that suggested the chemicals were subjected to a higher level of radiation following the seizure of the facility. Indeed, inspectors repeatedly surveyed the Beta Chem facility both before and during the Indictment period, and found extensive radiological contamination on surfaces and containers in the facility.

Furthermore, inspectors handled the containers on only two occasions following the seizure. First, in January 2014, the EPA executed a search warrant at Beta Chem and took samples from 12 containers. Inspectors did not handle other containers. Second, in May 2014, inspectors inventoried the containers in the facility and collected approximately 1,100 samples for radiological testing during a Superfund cleanup. While taking samples, EPA inspectors monitored the air for radiation, which never rose above background level, and took each sample within approximately 30 seconds, thereby limiting the amount of time each sample was exposed to the laboratory environment. Inspectors also disposed of pipettes and wipes after taking each sample. These mitigating strategies reduced the likelihood of cross-contamination during handling and sampling. As Defendant notes, none of the 20 samples that were sent for testing to the EPA's National Enforcement Investigation Center ("NEIC") in January 2014 tested above background level for radiation, and less than half the chemicals that Lemon tested in June 2014

tested above background level.[20]  This suggests that chemicals were not exposed to greater contamination during the period between the seizure in October 2013 and the testing in June 2014.

The Court recognizes the possibility that the temporal gap between the KDHE seizure and Lemon's testing, as well as the handling and sampling of containers, could have exposed containers and chemicals to a greater level of contamination than they would have reflected had the testing been performed shortly after the seizure.[21]  But this concern affects the weight to be given the test results and Lemon's testimony, rather than the evidence's admissibility. Accordingly, the Court denies Defendant's motions to exclude Lemon's testimony and his report.[22]

**D.      Testimony of Andrew Diekemper and Paul Otto**

Defendant also moves to strike the testimony of Andrew Diekemper and Paul Otto. Andrew Diekemper testified as a former captain at the Lenexa Fire Department about Defendant's certificate of occupancy application in 1993, describing several chemicals to be stored at Beta Chem that were listed on the application.  Captain Diekemper also testified about fire inspections he did at Beta Chem in the mid-2000s, and concerns he had after later learning that Defendant was storing chemicals in a loft area above the Beta Chem facility.  Defendant argues that Captain Diekemper's testimony regarding Defendant's certificate of occupancy

---

[20]One sample that was not sent to the NEIC for testing did show elevated beta radiation. Ex. 107 at 6.

[21]The Court heard no evidence that chemicals or containers already in a contaminated environment are likely to reflect a greater level of contamination simply by remaining in the environment.  To the contrary, Lemon testified that "most radiochemicals are going to remain where they're at."  Tr. 869:1–2.

[22]Defendant also argues that Lemon's report is "inconsequential" because it reflects testing of only a few chemicals on the Government's Bill of Particulars.  Doc. 69 at 17.  The Court does not construe this as an argument against the admissibility of the report, but rather an argument as to the weight the report should be given, which is addressed later in this opinion.

application and former fire inspections at Beta Chem are improper Rule 404(b) evidence and irrelevant to the crimes charged in the Indictment. The Court agrees. Evidence of Defendant's certificate of occupancy application and fire inspections at Beta Chem are well outside the Indictment period and are not intrinsic to the crimes charged. The Court also strains to see the relevance of this evidence, as the 1993 application does not reflect the chemicals at the facility during the Indictment period and Captain Diekemper testified that fire code inspectors were not focused on identifying hazardous chemicals during their inspection.[23] Accordingly, the Court grants Defendant's motion to strike as it relates to Captain Diekemper's testimony concerning Defendant's 1993 certificate of occupancy application and previous fire code inspections.

Paul Otto testified as a former captain of the Olathe Fire Department's bomb squad about responding to the Beta Chem facility in January 2014 to remove a chemical bottle from the loft that he was told contained a derivative of ether, a hazardous chemical. Captain Otto was shown Exhibit 143, a photograph of a bottle labeled "ethyl acetate 99.5+ %." Although this photograph was not of the bottle that Otto actually found in the loft, Otto testified that it was "very consistent" with the bottle he found.[24] Otto testified that he removed the bottle from the loft area and that FBI and fire department officials ruptured the bottle to empty the remaining contents. The contents of the bottle were never tested to determine their chemical makeup.

Defendant argues that Otto's testimony "was a ruse" and that his testimony is "empty evidence" because no photos of the actual chemical bottle were offered and the contents were not maintained or submitted for analysis.[25] Defendant thus objects to this testimony and Captain

---

[23]Tr. 657:17–658:4; 662:1–21.

[24]Tr. 758:12–23.

[25]Doc. 69 at 19.

Diekemper's testimony regarding the removal of this container.[26] The Court finds that the lack of testing and the lack of a photograph of the actual container go to the weight of Captain Otto's and Captain Diekemper's testimony on this issue, rather than their admissibility. Accordingly, the Court overrules Defendant's objection to Otto's testimony and to Captain Diekemper's testimony on this issue.

### E. Objections Related to Unemployment Insurance and Taxes

Defendant also objected to the testimony of John Vining and Charla Wagner. Vining is the chief of contributions for unemployment tax with the Kansas Department of Labor. He testified about the status of Beta Chem's unemployment insurance account and that Defendant paid unemployment insurance taxes in the late 1990s and early 2000s. Defendant objected to Vining's testimony on the basis of relevancy and under Rule 404(b). Charla Wagner is the supervisor for the corporate income tax audit group in the Kansas Department of Revenue. She testified that she found state income tax returns for Beta Chem for 2003 and 2008, but did not find returns for other years. Defendant objected to the admission of the returns and Wagner's testimony on relevancy grounds.

The Court sustains Defendant's objections to these witnesses' testimonies. Vining's testimony regarding the termination of Defendant's unemployment insurance account is improper Rule 404(b) evidence and is largely irrelevant to the RCRA charge. Whether Defendant made contributions to the unemployment insurance fund as required by Kansas law is of little consequence to the determination of whether the chemicals in the Beta Chem facility

---

[26] *See* Doc. 69-3 at 7 (objecting to "[e]ntire testimony concerning bomb squad removal of a substance that was never tested.").

were waste.[27]  Similarly, the Court finds that the limited relevance of Wagner's testimony regarding Beta Chem's state income tax returns to the RCRA charge is outweighed by the prejudice of the testimony to Defendant under Fed. R. Evid. 403.  The figures in the 2003 and 2008 returns have little bearing on whether Beta Chem was a going concern during the Indictment period.  Wagner's testimony that she did not find any other state income tax returns is also of limited relevance to whether Beta Chem was operational during 2012 and 2013, because Beta Chem's income is reflected in Beta Chem's and Defendant's federal tax returns for those years.  Accordingly, the Court sustains Defendant's objections to these witnesses.

## II.     Findings of Fact

The following facts are either stipulated by the parties, or found by the Court beyond a reasonable doubt based on the evidence admitted at trial.

Defendant Ahmed El-Sherif obtained a master of science degree in chemistry from Arkansas State University in 1983 and studied chemistry at Arizona State University in pursuit of a doctoral degree, although he did not obtain a doctoral degree.  Following his education, he worked in several laboratories in the field of radioactive synthesis.  In 1996, Defendant incorporated Beta Chem, Inc. ("Beta Chem"), a small laboratory that focused on the synthesis of radioactive isotopes utilized in research and medical applications.  Defendant was Beta Chem's owner, president, and sole shareholder.  On July 15, 1998, Beta Chem was forfeited as a corporation, but Defendant continued to operate the laboratory as a sole proprietorship.  In September 1998, Defendant entered into a lease agreement for Beta Chem to lease space at a 30-unit office/warehouse complex in Lenexa, Kansas.  Beta Chem acquired commercially available

---

[27]The Government presented evidence that an employee worked for Defendant, in an unpaid capacity, in 2012.  This undercuts the value of Vining's testimony, which is ostensibly to show that Defendant was not employing anyone leading up to and during the relevant period in the Indictment.

chemicals and substances from wholesale vendors for use in its laboratory work.  Defendant

primarily stored these chemicals in their original containers.[28]

## Initial Radioactive Materials License Inspections and Issues

Defendant originally obtained a radioactive materials license from the KDHE in March

1993 for an entity called International Chemicals Enterprises, and the license was subsequently

amended to name Beta Chem as the licensee.  Kansas is an "agreement state," meaning that it

has an agreement with the United States Nuclear Regulatory Commission ("NRC") to regulate

certain radioactive materials that would otherwise be regulated federally.  As an agreement state,

Kansas's regulations must be compatible with those of the NRC.  For example, one regulation

requires that possessors of radioactive materials over a certain limit provide financial assurance

for decommissioning.  This financial assurance requirement was enforced sporadically in the

1990s, but beginning in the early 2000s, the NRC began focusing more on this issue and how

states were dealing with financial assurance.  As a result, the KDHE increased its enforcement of

the financial assurance requirement.  The KDHE reviewed Beta Chem's license, which revealed

that Beta Chem's radioactive materials levels required it to meet the financial assurance

requirement.

Defendant failed to meet the KDHE financial assurance requirement, and thus the KDHE

conducted an inspection of Beta Chem on September 20, 2005.  The inspection revealed elevated

levels of radioactive contamination throughout the facility, including in the laboratory area, the

bathroom, and the office.  Several areas, including a refrigerator that contained volatile

chemicals used in Defendant's synthesis operations, had radiation contamination at levels so

high that the inspectors' instruments could not read them.

---

[28]*See, e.g.*, Exs. 61–62 (photos of chemicals in Sigma-Aldrich containers).

Following the inspection, on September 21, 2005, the KDHE issued an Emergency Order of Suspension of Beta Chem's radioactive materials license.[29]  Among other things, the Emergency Order required Beta Chem to immediately suspend all use of radioactive materials, safely store all radioactive materials, and submit a plan for remediation of radioactive contamination.  The Emergency Order also prohibited Defendant from removing any items from Beta Chem without demonstrating to the KDHE that the items were free from radioactive contamination.  Defendant appealed the order, but after he failed to appear for the appeal hearing, the Emergency Order became final in February 2006.  The KDHE sent Defendant a letter on September 28, 2005, identifying areas that were found to be contaminated during the September 20 inspection and listing information Defendant would need to respond to the Emergency Order.[30]

<div align="center">

**Initial RCRA Inspection**

</div>

On September 23, 2005, after receiving notification of the KDHE's inspection, the EPA conducted an inspection of Beta Chem under RCRA.  Trevor Urban, an EPA RCRA inspector, conducted the inspection.  Doug Ferguson, with EPA's Superfund program, also participated in the inspection.  During the inspection, Ferguson conducted a radioactive contamination survey, and again found elevated levels of contamination throughout the Beta Chem facility.  During the inspection, Urban observed closed and open containers that were labeled as containing various chemicals, some of which were volatile.  Urban also observed chemicals in beakers throughout

---

[29]Ex. 10.  Four different status levels apply to KDHE radioactive materials licenses.  First, an "active" license allows the licensee to conduct ordinary business under the license.  Second, a "suspended" license is still "under license," but the licensee must meet certain requirements to bring the license back into "active" status.  Third, a "revoked" license is still "under license," but requires the licensee to comply with the revocation order and then re-apply for a new license.  Finally, a "terminated" license is no longer "under license," and termination requires that a site be cleaned up and released for unrestricted use.  Tr. 450:5–452:1.

[30]Ex. 28.

<div align="center">

14

</div>

the laboratory.[31]  Urban discussed what P-listed wastes are with Defendant.  Based on the investigation, Urban classified Beta Chem as a Kansas small-quantity generator.[32]  In several follow-up visits, Urban observed that some chemical beakers had been cleared from the facility, but a lot of chemical containers remained.

Kevin Snowden, an EPA RCRA compliance officer, spoke with Defendant in September 2006, following the 2005 RCRA inspection.  Snowden memorialized his conversation with Defendant in an October 2006 email, which Defendant acknowledged.[33]  He explained that the EPA believed Beta Chem was a generator of solid waste, and thus it was required to conduct waste determinations at its facility.  Snowden also explained the hazardous waste codes that applied to the potential hazardous wastes stored at the facility, including codes for hexane, acetone, and ether.  He also discussed the EPA's concerns about leaving containers with hazardous chemicals open, pouring hazardous chemicals down a drain without a permit, and how the EPA recommended storing hazardous wastes on site in a tank or closed container.  Finally, Snowden told Defendant to never accumulate more than 25 kilograms, or 55 pounds, of hazardous waste at the facility.  Snowden explained that if "Beta Chem Lab accumulates more than 25 kilograms of waste, the facility would become a 'Kansas Generator.'  A Kansas Generator must follow additional requirements including but not limited to labeling and dating hazardous waste storage containers, training employees on the proper handling of hazardous wastes, etc."[34]  Based on his conversation with Defendant and Defendant's responses, Snowden

---

[31]*See* Exs. 19, 21, 22.

[32]There are several categories of waste generators in Kansas, which are determined by the amount of waste generated and are subject to different requirements.

[33]Ex. 87a.

[34]*Id.*; *see* Tr. at 375:2–15.

sent a letter of compliance to Beta Chem and closed out the RCRA investigation on October 10, 2006.

In conjunction with the initial RCRA inspection, Beta Chem was assigned a RCRA ID number and was monitored for compliance with RCRA. During the time period from January 1, 2005 through October 4, 2013, neither Defendant nor Beta Chem possessed a permit to store hazardous waste at the Beta Chem facility under RCRA.[35]

### Follow-Up Radioactive Inspections

On June 14, 2006, David Whitfill of the KDHE conducted a follow-up survey for radioactive contamination at Beta Chem. The primary objective of this investigation was to determine whether Defendant was still working with radioactive materials, despite the suspension of his radioactive materials license. Whitfill found no evidence that Defendant was continuing to work with radioactive materials, but he found continued elevated levels of contamination throughout the facility. In June 2007, Defendant and the KDHE entered into a Consent Agreement and Final Order, which incorporated the terms of the Emergency Order of Suspension from September 2005.[36] The Consent Agreement required Defendant to submit to the KDHE a plan for bringing Beta Chem back into working condition and establishing methods for removal of radioactive contamination and disposal of radioactive waste. Under the Consent Agreement, chemicals or chemical containers that were contaminated with radiation could not be used or sold. Beta Chem was required to submit a comprehensive plan to bring the facility back into compliance with KDHE regulations, which included outlining acceptable levels of remedial radiation contamination and describing methods for disposal of radioactive waste.[37] The

---

[35]Doc. 50 (stipulation).

[36]Ex. 32.

[37]*Id.* at 4.

Consent Agreement also stated that before the KDHE would consider fully reinstating Beta Chem's radioactive materials license, Beta Chem would need to submit a renewed application.

In 2007, Defendant asked Ronald Dobey, a radiation consultant, to help him with the radiation issues identified by the KDHE. Dobey conducted a radiation survey at Beta Chem, and submitted a report to Defendant on March 17, 2008. In his report, Dobey noted elevated levels of radiation in several areas in the Beta Chem facility, and he recommended that Defendant remove as much loose radioactive contamination as possible before submitting an application for a radioactive materials license. Dobey also explained that Defendant needed to dispose of any unwanted chemicals in a manner consistent with EPA and KDHE regulations.

On July 10, 2007, Dobey wrote a letter to Thomas Conley, director of the KDHE's radiation control program.[38] He described the radiation levels he found at Beta Chem during his inspection, and noted that the highest levels of radiation were found in the main laboratory area of the facility. Dobey also described the steps Beta Chem would need to follow to reach its goal of reinstating its radioactive materials license, including removing contamination, segregating and removing waste from the facility during the decontamination process, and putting in place a rigorous survey program to prevent contamination from recurring.

On April 8, 2008, the KDHE conducted another inspection at Beta Chem and surveyed radioactive contamination levels. This survey again found elevated levels of contamination throughout the laboratory. Based on the continued detection of radioactive contamination, the KDHE notified Defendant in August 2008 that his radioactive materials license was being revoked. Defendant did not contest the notice of revocation, so the revocation became effective on November 10, 2008. Conley met with Defendant at the KDHE's offices in 2009 and

---

[38]Doc. 47.

explained the conditions of the revocation order and the steps Defendant would need to take to decontaminate the facility and regain his radioactive materials license. Defendant expressed that he wanted to comply with the requirements of the order and regain his license.

In July 2011 and January 2012, the KDHE conducted additional inspections at Beta Chem to determine radioactive contamination levels. These inspections revealed elevated contamination levels at the facility. On February 27, 2012, the KDHE sent a letter to Defendant, in which it described its findings during the January 2012 inspection, and explained that "the major obstacle" to the KDHE's consideration of a new license for Beta Chem was that Defendant had not eliminated the contamination in accordance with the 2007 Consent Agreement.[39]

### Discussions with Shaw Environmental

In October 2012, Defendant contacted Shaw Environmental ("Shaw"), a firm that provides, among other things, radioactive contamination remediation services. Defendant explained to Shaw that his license had been suspended, and he requested a proposal from Shaw to decontaminate the facility so he could get his license back. Greg Coffman, a project manager at Shaw, discussed with Defendant what the KDHE would require for Defendant to obtain a new license, including decommissioning the facility and applying for a new license.

On January 24, 2013, Shaw submitted a proposal to Defendant to perform a radiological site visit at Beta Chem to determine levels of radiological contamination and establish requirements for decommissioning the facility. Shaw's proposed cost of this work was $20,350. Defendant responded that the proposal looked good, but he wanted to talk about some aspects of

---

[39]Ex. 40.

the project. Shaw submitted a second proposal to Defendant on February 21, 2013.[40]  In this proposal, Shaw revised down its estimated cost for the decommissioning phase of the project to $15,500.  Defendant responded that he needed to make sure the agreement would include the steps necessary to get the KDHE's approval for a renewed license.  Coffman responded that this agreement would accomplish that.  Defendant later had an in-person meeting with Coffman, but he never retained Shaw to perform the decommissioning.

In April 2013, Conley met with Defendant and representatives of Shaw, during which Conley outlined the KDHE's expectations for decontamination at Beta Chem.  Conley had no further communications with Defendant or Shaw.

### Emergency Order and Seizure

On August 8, 2013, the KDHE issued an Emergency Order to Seize and Secure Radioactive Material.[41]  The Emergency Order summarized the previous KDHE inspections at Beta Chem and found that Defendant had failed to decontaminate the facility.[42]  On October 4, 2013, the KDHE executed the Emergency Order and seized the Beta Chem facility.  The KDHE changed the locks at the facility and restricted access to the KDHE, and thus Defendant no longer had access after this date.  The KDHE also took photographs of the facility and chemical containers during the seizure,[43] but did not remove or disturb chemicals at the facility.

### January 2014 RCRA Inspection and Chemical Testing

In October 2013, Kim Bahney, a special agent with the EPA Criminal Investigation Division ("CID"), learned about the KDHE's seizure of Beta Chem after reading a news article.

---

[40]Ex. 51.

[41]Ex. 44.

[42]*Id.* at 14.

[43]Exs. 54–79.

After coordinating with Conley and the KDHE, Bahney sought and obtained a search warrant under RCRA to inspect Beta Chem for hazardous waste. She arranged for testing to be conducted during the search and for samples to be sent to the EPA's NEIC. The NEIC understood that it would be testing samples for hazardous waste.

On January 22, 2014, Bahney, along with members of the EPA CID, the NEIC lab, the KDHE, and the FBI, executed the search warrant at Beta Chem. Members of the NEIC lab took multiple samples from 10 containers that they suspected were hazardous waste, for a total of 22 samples. Of these, 20 samples were sent to the NEIC lab, and two were not sent because of a septum across the neck of one bottle, and "elevated beta radiation detected in the" other sample.[44] None of the samples sent for testing showed elevated levels of radiation.[45] No other containers were opened during this visit. NEIC inspectors took photographs of chemicals in the facility during this inspection.[46] Inspectors found no records of disposal of hazardous waste, hazardous waste determinations, or monthly inspection reports. Bahney testified that the lab appeared cluttered, and inspectors noticed peroxide crystals, which are shock and friction sensitive, in and on several containers.

The NEIC's analysis of the 20 samples collected during this visit revealed that 18 samples, or seven of the eight containers analyzed, contained volatile organic compounds and met RCRA hazardous waste characteristics.[47] The NEIC performed a gas chromatography/mass spectrometry analysis (also called "volatile organic analysis" when highly pressurized organic molecules are involved) on the samples, which revealed the major constituents of seven of the

---

[44]Ex. 107 at 6.

[45]*Id.* at 10.

[46]Exs. 111–36, 159–61.

[47]Doc. 107 at 4–6, 10.

eight containers.[48]  This testing revealed that the major constituents of these containers matched

that reflected on the containers' labels.  That is, the chemical listed on the container was the

same reflected by the gas chromatography/mass spectrometry analysis.[49]  The Government

submitted the NEIC's analysis as Attachment 1 to its Bill of Particulars.[50]

Adam Hill, with the FBI's Hazardous Evidence Response Team ("HERT"), was also

present during the January 22 search of Beta Chem.  Hill learned that the Beta Chem facility had

a loft area above the ceiling tiles, and after donning protective gear, he accessed the loft area to

search for any hazardous chemicals that might be there.  The loft area contained a disheveled

assortment of lab equipment, Sigma-Aldrich boxes, papers, glass bottles, and other containers.[51]

After he saw the Sigma-Aldrich labels on boxes, Hill moved carefully to avoid jostling boxes

and containers because he did not know "what the contents might've been or their stability

levels."[52]  While searching the loft, Hill found two glass bottles in a cardboard box.  One of the

bottles was brown and labeled "ether anhydrous 99 percent," and it had warning labels stating

that the contents of the bottle may form explosive peroxides and that the bottle contained a

flammable liquid.  Hill inspected the bottles and observed crystallization within both bottles.

Hill and members of the HERT and the EPA decided to leave the bottle in place because they

believed the peroxides could cause the contents of the bottle to spontaneously combust if

exposed to any type of friction.

---

[48]Tr. 976:2–15; 988:23–996:22.  One of the samples was not subjected to volatile organic analysis, meaning
that the major constituents were not revealed.

[49]*See* Doc. 52-1.

[50]*Id.*

[51]*See* Ex. 129.

[52]Tr. 745:20–23

Paul Otto, captain of the Olathe Fire Department's bomb squad, responded to the Beta Chem facility at the request of the FBI, and he was notified that there was potential ether on site. Captain Otto put on a hazmat suit and entered the loft area of the Beta Chem facility. He found "significant amounts of storage," including cardboard boxes, papers, and glass bottles, as well as a furnace unit. Captain Otto also found a brown bottle that was labeled as containing a derivative of ether and was wrapped tightly in plastic wrap.[53] Captain Otto brought the brown bottle down from the loft area. He testified that typically with ether, the Fire Department detonates the substance using explosives and gasoline. However, in this instance, members of the bomb squad were concerned that potential radioactive contamination on the container might spread if the substance was detonated, so the container was ruptured and the remaining liquid released into the plastic wrap surrounding the container. The contents of the bottle were never tested to determine their chemical composition.

### Superfund Cleanup and Radiological Testing

During the January 22 inspection of Beta Chem, Ferguson surveyed the facility for radioactivity, and found contamination throughout. Based on his observations and his concern that hazardous chemicals from the facility could release into the environment, Ferguson recommended that the EPA conduct a "time-critical removal" action, or a Superfund cleanup, at Beta Chem. The cleanup began on May 5, 2014 and was completed on March 6, 2015.

---

[53]During Captain Otto's direct examination, the Government referenced Exhibit 143, a picture of a bottle labeled "Ethyl acetate, 99.5+%" that is contained within plastic wrap. Ex. 143. Captain Otto acknowledged that this was not a picture of the actual bottle that he found in the loft space at Beta Chem, but that it "looks very consistent with the bottle that I found." Tr. 758:19–23. Captain Otto did not testify as to what was on the label of the actual bottle that he found in the loft, but he testified that ethyl acetate is a derivative of ether, and that he dealt with the bottle as though it contained ether. *See* Tr. 762:3–8, 763:14–24. Therefore, the Court finds that the bottle Captain Otto found in the loft was labeled as containing an ether derivative.

The EPA contracted with the environmental consulting firm Tetra Tech to assist with the Superfund cleanup. At the end of each day, Tetra Tech personnel locked the Beta Chem facility. During the cleanup, Tetra Tech assessed the facility for radiation and found elevated levels throughout. Tetra Tech also inventoried 1,138 containers in the facility, and compiled an inventory report that included container ID numbers, chemical names when known, the volume of the containers, and the chemical state.[54] Daniel O'Connor, who was a project manager for Tetra Tech at the time of the cleanup, testified that of these 1,138 containers, 252 containers either had no label or had a handwritten label.[55] Thus, 886 containers had "intact" manufacturer labels with no handwriting on them.[56] Tetra Tech personnel relied on the accuracy of these "intact" labels in creating the inventory report. Tetra Tech did not conduct testing on these containers to verify their contents.[57] Relying on these labels, Tetra Tech submitted a report that contained a list of chemicals that could be considered P-listed or U-listed wastes under RCRA, which the Court admitted in this case and which the Government submitted as Attachment 3 to its Bill of Particulars.[58] The total weight of potential P-listed wastes on this list was 3.87 pounds, and the total weight of the potential U-listed wastes was 155.1 pounds.[59]

As for the other 252 containers, which had either no label or a handwritten label, Tetra Tech did not rely on the writing on the containers to determine the contents contained therein. Instead, Tetra Tech performed field testing on the contents of these containers, which tested for

---

[54]Ex. 183.

[55]Tr. 922:2–13, 924:10–16.

[56]*See* Tr. 921:20–922:5.

[57]Tr. 923:16–20.

[58]Ex. 110a; Doc. 52-3; Tr. 952:17–953:14; *see* 40 C.F.R. § 261.33 (listing P- and U-listed wastes). The Government amended the original list of these wastes by removing several chemicals from the list. *See* Ex. 110; Doc. 29-3.

[59]Tr. 1040:12–1041:1.

ignitability, oxidizer ignitability, corrosivity, and water reactivity, each of which is a hazardous

waste characteristic under RCRA.[60]  Tetra Tech field screened a total of 270 samples,[61] 85 of

which tested positive for one of the hazardous characteristics listed above.  Tetra Tech compiled

tables that listed the chemicals that tested positive for these characteristics, which the

Government submitted as Attachment 2 to its Bill of Particulars.[62]  Dr. Helmich with the NEIC

calculated the weights of the chemicals on these tables based on information he had regarding

the chemicals' densities.  The weights of these chemicals are as follows: Ignitable Oxidizers,

approximately 3.95 pounds; Ignitables, approximately 23.1 pounds; Corrosives, approximately

17.09 pounds; Reactives, approximately 0.13 pounds.[63]

Tetra Tech also collected 1,100 samples for radiological testing.  Approximately 430

samples were wipe samples taken from outside the chemical containers.  The other

approximately 670 samples were chemical samples taken from inside the containers.  While

collecting samples, Tetra Tech took steps to reduce the likelihood of exposing samples to

radiation within the facility.  Tetra Tech monitored the air inside the facility and never observed

radiation levels that exceeded the standards set by the NRC.  Tetra Tech personnel disposed of

sampling pipettes and wipes after a single use.  Additionally, O'Connor testified that the process

---

[60]40 C.F.R. §§ 251.21–261.24.

[61]The number of samples that Tetra Tech field tested (270) is greater than the number of containers without "intact" manufacturer labels (252).  It appears that Tetra Tech may have field tested some containers that had "intact" manufacturer labels.  *Compare* Tr. 954:4–6 (O'Connor testifying that some of the chemicals in containers with "intact" labels "may have been field screened"); *with* Tr. 923:18–20 (O'Connor testifying that "[f]or the most part we did not [conduct field testing] if there was a manufacturer label and there was no question of the container's contents.").  For example, Container Number 5 is listed as Benzene on Attachment 3 to the Government's Bill of Particulars, which is the list of potential P- and U-listed wastes based on container labels.  Ex. 110a; Doc. 52-3. Container Number 5 also appears on Attachment 2 to the Government's Bill of Particulars as a chemical that field tested as ignitable.  Ex. 109a; Doc. 52-2.

[62]Ex. 109a; Doc. 52-2.  The Government amended Exhibit 109 and the original Attachment 2 to its Bill of Particulars during trial by removing several containers that it no longer contended met hazardous characteristic requirements under RCRA.

[63]Tr. 1036:7–1038:5, 1039:1–1040:6.

of taking samples took approximately 30 seconds per sample, and that the lids to the chemical containers and the sample vials were closed after samples were taken.

In May 2015, Conley contacted Michael Lemon, a chemist and the radiation safety officer at the University of Kansas, to see if Lemon would perform analysis on the samples Tetra Tech collected for radiological testing. Lemon agreed to help, and Ferguson and O'Connor delivered the 1,100 samples in several shipments to Lemon in June 2014. Lemon tested each of the samples for radioactivity using a liquid scintillation counter. The counter read out a number reflecting the decays per minute ("dpm") in a given sample, and Lemon adjusted that number to reflect the dpm level minus the background level. This testing showed that all 430 wipe samples from outside the containers were contaminated with radiation above the background level, and that approximately 45% of the 670 samples taken from inside the containers were contaminated with radiation above the background level. More than a dozen chemicals that showed radiation contamination above background level in Lemon's report were included on the Government's list of suspected hazardous wastes.[64]

### State of Chemicals as of 2012–2013

As of the relevant period in the Indictment in 2012 through 2013, many chemicals in the Beta Chem facility had been stored for years. Special Agent Bahney testified that some of the same chemical containers that appeared in photographs from the 2005 EPA inspection were in photographs of the facility from October 2013. Some of these chemicals are identified as potential hazardous wastes on the Government's Attachments to its Bill of Particulars. For example, a bottle of borane tetrahydrofuran with handwriting that said "opened 01, 10, 03,"

---

[64]Doc. 69-2.

appeared in photos of the lab from 2005 and 2013.[65]  Other chemicals contained labels indicating

they had been stored on-site for years.  A bottle of tetrahydrofuran, with handwriting stating

"opened 5, 11, 00," appeared in a photo from 2013.[66]  A bottle of acetyl chloride, with a

handwritten date in 2001, appeared in a photo from 2013.[67]  A bottle of tetrahydrofuran, with a

handwritten date of "05, 20, 05," appeared in 2013.[68]  A jug of hexane, with "Aug. 09"

handwritten on the label, also appeared in 2013.

Photographs taken by NEIC personnel during the execution of the search warrant at Beta

Chem on January 22, 2014 also showed containers of chemicals that had apparently been on-site

for years and that were included in the Government's Bill of Particulars.  These chemicals

included a bottle of tetrahydrofuran with "05, 30, 05" handwritten on the label,[69] and a bottle of

benzene with "opened 2.8.10" handwritten on the label.[70]  Additionally, photographs taken

during the EPA's Superfund cleanup beginning in May 2014 showed containers of chemicals

that had been on-site for years.  These included a container of ether anhydrous, a chemical on the

Government's Bill of Particulars, with handwriting stating "opened" in December 2009 and a

manufacturer's label stating an expiration date of September 2010.[71]

Defendant also failed to properly store certain chemicals for laboratory use.  Several

chemical containers whose labels stated "store refrigerated" or "temperature sensitive," were

---

[65]Exs. 16, 71.

[66]Ex. 70; Doc. 52-1 at 2 (Attachment 1 to Government's Bill of Particulars listing tetrahydrofuran); Doc. 52-3 at 2 (Attachment 3 to Government's Bill of Particulars listing tetrahydrofuran).

[67]Ex. 69; Doc. 52-3 at 1 (Attachment 1 to Government's Bill of Particulars listing acetyl chloride).

[68]Ex. 63; Doc. 52-1 at 2 (Attachment 1 to Government's Bill of Particulars listing tetrahydrofuran); Doc. 52-3 at 2 (Attachment 3 to Government's Bill of Particulars listing tetrahydrofuran).

[69]Ex. 107 at 90; Doc. 52-1 at 2 (Attachment 1 to Government's Bill of Particulars listing tetrahydrofuran); Doc. 52-3 at 2 (Attachment 3 to Government's Bill of Particulars listing tetrahydrofuran).

[70]Ex. 107 at 87; Doc. 52-3 at 1 (Attachment 3 to Government's Bill of Particulars listing benzene).

[71]Ex. 161; Doc. 52-3 at 2 (Attachment 3 to Government's Bill of Particulars listing ether anhydrous).

stored in a refrigerator that was not operational.[72]  Further, Dr. Helmich testified to photographs

that showed the fume hood area in the lab was being used as storage for chemical containers.

The containers covered the entire space underneath the fume hood, so the space could not be

used as a work area.  Defendant also stored chemical containers on their side, which could allow

the contents to attack the container lid and cause a leak into the laboratory.[73]  One container, a

gallon-sized jug that had a small amount of liquid inside, was covered by Parafilm (a material

similar to Saran Wrap) and had a tube running into it.  Dr. Helmich testified that the lack of a

tight seal between the Parafilm and the tubing could cause vapors from the contents of the

container to be released into the laboratory.  To their surprise, inspectors found some chemicals

stored in a file cabinet in the office area of the Beta Chem facility.[74]  At least one container had

the word "waste" handwritten on the label.[75]

The evidence at trial also demonstrated that the value of the chemicals at Beta Chem was

low, or perhaps non-existent, as of 2012–2013.  As part of the Superfund removal process,

Ferguson conducted an evaluation of unopened containers labeled as hazardous substances to

assess them for resale value.  Using an online catalogue that listed prices for new chemicals,

Ferguson estimated that the value of these chemicals—if they were new and de-contaminated—

was approximately $2,000 to $3,000.  Because of this low estimated value and the cost of

decontaminating the containers, the EPA disposed of these substances.  Furthermore, Defendant

stated on Beta Chem's tax returns in 2010, 2011, 2012, and 2013 that Beta Chem had no assets.[76]

---

[72]Tr. 943:15–22, 90:7–18; Ex. 128.

[73]Tr. 1011:21–1012:8; Exs. 57, 64, 65.

[74]Ex. 113.

[75]Ex. 64.

[76]Ex. 173 at 1–3, 10.

In an April 8, 2014 email, Defendant's attorney William Session explained to EPA attorney Kristen Nazar that Defendant believed there was some commercial value in some of the chemicals and lab equipment in the Beta Chem facility.[77] Session stated that David Culp, with Chase Environmental, and possibly a local chemicals broker "could help assess the viability of that possibility during" a potential site visit.[78] Session's statements regarding the value of chemicals and lab equipment were based on information from Defendant, rather than an independent assessment by an outside party.[79] No evidence was presented at trial that supported Session's statements that the chemicals or equipment had commercial value or could be distributed for a profit by a chemicals broker, especially when many of the chemicals were contaminated. To the contrary, the evidence showed that the chemicals, even those that were not expired or contaminated, had limited resale value.[80]

### State of Beta Chem Operations as of 2012–2013

As of the relevant period in the Indictment, Defendant had ceased nearly all business operations at Beta Chem. Under the KDHE Emergency Order issued in 2005, which remained in effect until the KDHE seized the facility in 2013,[81] Defendant was prohibited from conducting any "activities involving the use of radioactive materials authorized by [Beta Chem's] radioactive materials license."[82] Further, the Emergency Order prohibited Defendant from

---

[77]Ex. 808.

[78]*Id.*

[79]Tr. 1446:6–1447:6.

[80]Tr. 99:8–100:12 (Ferguson testifying that analysis of chemicals revealed worth of between $2,000 to $3,000 if chemicals were unopened and not contaminated); *see* Tr. 716:16–716:12 (Dr. Edwin Austin, associate director of environmental health, safety and security for Sigma Aldrich, testifying that expired chemicals have no commercial value, and that Sigma Aldrich does no re-sell opened chemicals because cost of verifying contents far exceeds commercial value of a chemical bottle).

[81]Tr. 1315:11–15; 1317:10–17.

[82]Ex. 10 at 3.

transferring any radioactive material or removing any items from the facility before showing the

KDHE that the items were free from contamination.[83]

Despite these restrictions, Defendant continued to acquire chemicals and conduct some

business activities through 2011.  But by the beginning of 2011, Beta Chem's operations had

begun to shut down.  Defendant made his last payment to Kansas Gas Service in April 2010, and

in September 2010, the utility company informed him that Beta Chem's gas service was being

shut off.[84]  Beta Chem's business license expired in January 2011 after Defendant failed to pay

the required annual fee.  Defendant made his final purchase of chemicals from Sigma Aldrich in

March 2011, and he made his final purchase of any chemicals on November 17, 2011.  Although

Defendant struggled to make rent payments for the Beta Chem unit over the years—his landlord

testified that he paid rent six times in 2010, five times in 2011, and seven times in 2012—he

stopped paying rent altogether in 2013.[85]

Beginning in the fall of 2011, Defendant employed Sondra Phillips, a former student in

an organic chemistry course Defendant taught at Penn Valley Community College, in an unpaid

capacity to help him restart Beta Chem as a business.  Phillips testified that to her knowledge,

there were no existing customers and Defendant "wasn't doing much with Beta Chem" when she

began, and that Defendant wanted to "start from scratch."[86]  Because there were no incoming

customers, Defendant "wanted to do something completely different than what he used to do."[87]

Specifically, Defendant wanted to branch out into selling natural products, like soaps and body

---

[83]*Id.*

[84]Ex. 102 at 22–23; Tr. 1327:2–1328:3.

[85]Tr. 629:22–630:19, 632:19–634:4, 638:5–640:18.

[86]Tr. 567:15–19; 568:7–10.

[87]Tr. at 568:7–10; 568:23–24.

products.  Phillips researched soap formulas and sent out emails to prospective customers, but to her knowledge Beta Chem did not gain any new customers or receive any orders during her time working there.  Phillips stopped working for Beta Chem in the fall of 2012 because she had started graduate school and did not see any prospect of Beta Chem restarting as a business.

Several people who operated businesses near Beta Chem testified that they were not familiar with Defendant operating the lab during 2012–2013.  Doug Leonard operated a flooring business in the same business complex in Lenexa, three doors down from Beta Chem, from May 2004 through December 2016, and he was there five to six days a week.  Yet he did not recognize Defendant as the owner of Beta Chem.  Shane Jarvis operated a business a couple of doors away from Beta Chem beginning in 2010.  Although Jarvis knew most other tenants around his unit, he never met Defendant.  Jarvis testified that he once saw the owner of Beta Chem and saw a car frequently parked in front of the Beta Chem facility in the first year or two after Jarvis began operating his business, but he did not recognize Defendant.  After a year or two Jarvis saw the car less frequently.

Defendant made several statements after 2012–2013 that indicate Beta Chem was not a going concern during those years.  In an "ability to pay" form he completed on April 29, 2014, Defendant stated "[m]y interest in [Beta Chem] has no monetary value.  I am President of the defunct corporation."[88]  Additionally, in a July 2014 business proposal to the Center for Innovation and Entrepreneurship at Northwest Missouri State University, Defendant stated that he was interested in enrolling in a business incubator program "to help me 're-launch' a business venture in the life sciences area."[89]  Defendant explained that his "previous business," which

---

[88]Ex. 812 at 6.

[89]Ex. 98 at 1.

"specializ[ed] in the development and production of C-14 custom synthesized chemical compounds for use in the human and animal health pharmaceutical industry," was "now defunct."[90] Defendant explained that he founded the proposed business, which he referred to as "Beq," in 1993, and that Beq was "[s]eeking to resume active business operations after a several year hiatus."[91]

From the time when his radioactive materials license was first suspended in 2005 through the relevant period in the Indictment, Defendant consistently maintained an interest in regaining his radioactive materials license. Defendant unsuccessfully applied for a new license in 2008, and he had discussions with Conley, other KDHE staff, Shaw, and his attorney William Sessions about his desire to regain his license. Defendant also expressed an interest in restarting his business, as evidenced by his hiring Sondra Phillips, retaining Sessions, and preparing business plans for potential investors in 2012 and 2014.[92] Ultimately, Defendant never took the steps necessary to decontaminate the Beta Chem facility and regain his license.

## Ability to Pay Inquiry

In 2014, the EPA approached Defendant and his attorney, William Session, and asked whether Defendant would be performing the Superfund cleanup. Session responded that Defendant could not afford to pay for the cleanup. Based on Session's response, the EPA commenced a review of Defendant's ability to pay for the cleanup (known as an "ATP" analysis). The EPA conducts this review when a party that will potentially be responsible for paying for a cleanup asserts an inability to pay. The EPA sent ATP forms to Session to document Defendant's claimed inability to pay. Defendant submitted an ATP form to the EPA

---

[90]*Id.*

[91]*Id.* at 7.

[92]Exs. 98, 884.

through Session on September 29, 2014.[93]  Defendant also executed an IRS Form 4506-T, or a

"Request for Transcript of Tax Return," so that the EPA could obtain Beta Chem's income tax

returns for 2010, 2011, 2012, and 2013.

On October 22, 2014, after the EPA submitted Defendant's Form 4506-T to the IRS, the

IRS responded to the EPA that it could not provide the returns for Beta Chem for 2010, 2012, or

2013, and that the EPA needed to contact the taxpayer to determine why the IRS could not

provide the requested information.[94]  On the same date, the IRS sent to Defendant a notice

stating that "we can't provide tax information for tax year[s] 2010, 2012, or 2013 because you

didn't file a return."[95]  The EPA asked Session for copies of Beta Chem's 2012 and 2013

corporate income tax returns on January 6, 2015.  On January 12, 2015, the IRS received three

tax returns for Beta Chem for tax years 2010, 2012, and 2013, which were dated March 15, 2011,

March 10, 2013, and March 16, 2014, respectively.[96]  Also enclosed in the packet of returns was

a letter from Defendant, dated November 7, 2014, stating that "[t]his responds to your notice that

says I did not report tax documents for 2010, 2012, and 2013, copy enclosed.  I previously filed

these taxes using form 1120S."[97]  Also on January 12, 2015, the EPA received from Session

copies of Beta Chem tax returns for 2010, 2012, and 2013, along with the cover letter from

Defendant he wrote to the IRS that was dated November 7, 2014.[98]

Several of the figures contained in these tax returns are irreconcilable with other evidence

of Beta Chem's earnings and expenses presented at trial.  For example, each of the returns state

---

[93]Ex. 812.

[94]Ex. 170 at 21.

[95]Ex. 173 at 6.

[96]*Id.* at 1–3.

[97]*Id.* at 4.

[98]Ex. 167 at 1, 3–6.

that Beta Chem incurred $6,900 of deductible rental expenses. Although this figure is compatible with the amount of rent Beta Chem owed each year, it is inconsistent with FBI Special Agent Shara McGowan's calculation of the rental payments Beta Chem made in each year based on Defendant's personal tax return figures: $4,025 in 2010, $4,025 in 2012, and $0 in 2013.[99] The income reported on Beta Chem's returns for each year is also inconsistent with the income for Beta Chem that Defendant reported on his personal tax returns. The 2010 Beta Chem return reports net income of $0, while his personal return reports $10,000 for Beta Chem income.[100] Beta Chem's 2012 return reports a net income of negative $18,404, but his personal return reports a loss of $10,426 for Beta Chem that year.[101] Finally, the 2013 Beta Chem return reports a loss of $10,426, but Defendant's 2013 personal return states Beta Chem's income was $11,500.[102]

Jacob Nicholls, an accountant at EPA Region 7, conducted the ATP analysis for Defendant. He reviewed, among other documents, Beta Chem's corporate tax returns for 2010, 2012, and 2013, and Defendant's personal returns for 2011 and 2012. Nicholls testified that he understood Defendant had filed the Beta Chem returns on the dates stated on the returns. But Nicholls also testified that as of November 2014, he knew the IRS did not have tax returns on file for Beta Chem for tax years 2010, 2012, and 2013.[103] Nicholls also testified that he was aware of differences between Defendant's personal returns and Beta Chem's returns before he

---

[99]Tr. 1339:20–21, 1342:21–24, 1346:15–16; Ex. 173 at 1–3; *see* Ex. 96.

[100]Exs. 173 at 1, 172 at 1, 15.

[101]Exs. 173 at 2, 172 at 28.

[102]Exs. 173 at 3, 172 at 37, 43.

[103]Tr. 1134:11–24.

completed his ATP report.[104]  Nicholls did not contact Defendant or Session to gain additional

information about these discrepancies.

In conducting the ATP analysis, Nicholls used a computer model, INDIPAY, that ran "an

analysis and calculate[d] out potential future cash flows, along with additional debt capacity that

a respondent might have in order to help pay . . . for the cleanup costs."[105]  To enable INDIPAY

to calculate these figures, Nicholls plugged in numbers from Defendant's personal income tax

returns because Defendant was the potentially responsible party.[106]  Nicholls did not use numbers

from the Beta Chem corporate returns, and he never analyzed Beta Chem's ability to pay cleanup

costs, because Beta Chem was not the potentially responsible party.[107]

Nicholls submitted his ATP report to EPA attorney Nazar on February 18, 2015.[108]  He

explained that the INDIPAY model predicted Defendant could fund $16,761 of the proposed

CERCLA removal action amount of $520,700, but that "it is my opinion that Mr. Sherif cannot

afford to pay any of the proposed ceiling for the CERCLA removal action of $520,700 without

placing an excessive financial hardship on him and his family."[109]  Nicholls therefore

recommended that the EPA not seek the $16,761 from Defendant.[110]

## III.    Conclusions of Law

Defendant is charged with one count of knowingly storing hazardous wastes without a

permit under RCRA, in violation of 42 U.S.C. § 6928(d)(2)(A), and one count of corruptly

---

[104]Tr. 1142:16–1144:8.

[105]Tr. 1085:19–25.

[106]Tr. 1118:1–6, 1128:5–12.

[107]Tr. 1128:5–25.

[108]Ex. 170.

[109]*Id.* at 2; *see* Tr. 1150:22–23.

[110]Tr. 1148:21–24.

influencing, obstructing, and impeding an agency proceeding in violation of 18 U.S.C. § 1505.

The Court addresses each count in turn.

## A. Count 1: RCRA Charge

RCRA provides criminal penalties for "[a]ny person who . . . knowingly treats, stores, or disposes of any hazardous waste identified or listed under this subchapter . . . without a permit under this subchapter."[111]  Thus, a hazardous waste conviction under RCRA requires proof beyond a reasonable doubt that (1) the material at issue was "hazardous" as that term is defined under RCRA; (2) the hazardous materials at issue were stored as "waste" as that term is defined under RCRA; (3) the defendant knew that the waste he was storing was hazardous; and (4) the defendant stored hazardous waste without a permit to do so under RCRA.[112]  The parties stipulated that Defendant did not have a permit to store hazardous waste under RCRA from January 1, 2005 through October 4, 2013.[113]  Accordingly, the Court focuses its analysis on elements one through three of the charged offense.

### 1. Element One: "Hazardous" Materials

RCRA defines hazardous wastes as solid wastes that exhibit certain hazardous characteristics, or which are listed under RCRA regulations as "P-listed" or "U-listed" wastes. RCRA hazardous characteristics include ignitability, corrosivity, reactivity, and chemicals that are oxidizers.[114]  Dozens of chemicals that were stored at Beta Chem tested positive for these

---

[111]42 U.S.C. § 6928(d)(2)(A)

[112]*Id.*; *see* Doc. 69 at 13–14 (Defendant listing elements of charged offense); Doc. 70 at 57–58 (Government listing elements of charged offense).

[113]Doc. 50.

[114]40 C.F.R. §§ 261.20–24, 33.

characteristics.[115]  Furthermore, the Government presented evidence of dozens more chemicals stored at Beta Chem that were labeled as P-listed or U-listed hazardous chemicals.[116]

Defendant contends that the list of P-listed and U-listed chemicals "is absolutely meaningless" because this list relies only on label information from chemical containers, rather than testing that confirmed the actual chemical constituents of the materials.[117]  For several reasons, the Court finds Defendant's argument on the accuracy of this list unpersuasive.  First, the NEIC conducted testing on several samples taken from chemical containers in the Beta Chem facility to determine the chemical constituents inside the containers.[118]  For each sample tested, the testing revealed that the major constituents matched the label on the container.[119]  Second, the table of P-listed and U-listed wastes is based only on "intact" manufacturer labels, not handwritten or altered labels.  It is reasonable to presume the accuracy of these intact labels, as Defendant created handwritten labels when the chemical constituents inside the container did not match the manufacturer labels.[120]  Finally, it is doubtful Defendant could have operated his laboratory had he been unable to rely on the labels on chemical containers.  Indeed, Defendant created handwritten labels to identify chemicals that differed from the manufacturer labels on their containers.  For all these reasons, the Court gives full weight to the list of presumed P-listed and U-listed wastes in Exhibit 110a.

---

[115]*See* Ex. 109a (tables listing chemicals at Beta Chem that tested positive as ignitable oxidizers, ignitables, corrosives, and reactives).

[116]Ex. 110a.

[117]Doc. 69 at 15.

[118]Ex. 107.

[119]*Id.*

[120]*See, e.g.,* Ex. 107 at 5 (NEIC report showing that major constituents of contents in glass jar labeled "Petroleum ether, anhydrous" and marked "used hexane" was hexane).

The evidence at trial showed that certain chemicals stored at Beta Chem tested positive for hazardous characteristics under RCRA, and that other chemicals were labeled as chemicals that qualify as P-listed and U-listed wastes.[121]  Based on these findings, the Court concludes beyond a reasonable doubt that chemicals stored at the Beta Chem facility were "hazardous" as that term is defined under RCRA.

## 2.    Element Two: Hazardous Materials Were Stored as "Waste"

Hazardous materials are considered "hazardous waste" under RCRA only if they meet the definition of "solid waste."[122]  "Solid waste" is "any discarded material" that is not excluded from the definition of waste under RCRA regulations.[123]  "Discarded material," in turn, is defined as material that is "abandoned," "recycled," or "considered inherently waste-like."[124] The Government argues that the chemicals stored at Beta Chem were waste because they were "abandoned."[125]  Under 40 C.F.R. § 261.2(b), materials are considered abandoned if they are "disposed of" or "accumulated, stored, or treated (but not recycled) before or in lieu of being abandoned by being disposed of, burned or incinerated."

Several factual findings support the conclusion that hazardous chemicals stored at Beta Chem were stored in lieu of being abandoned, and therefore were solid waste.  First, several chemicals listed on the Government's Bill of Particulars were photographed at Beta Chem in

---

[121]*See* Exs. 107, 110a.

[122]*United States v. Self*, 2 F.3d 1071, 1076–77 (10th Cir. 1993).

[123]40 C.F.R. § 261.2(a).  There has been no suggestion in this case that the chemicals stored at Beta Chem fall under one of the exclusions to the definition of "waste" set forth under RCRA regulations.

[124]40 C.F.R. § 261.2(a)(2)(i).

[125]Doc. 70 at 57–58.

both 2005 and after the Government seized the facility in 2013.[126]  These chemicals had been

onsite for nearly a decade, and many contained markings showing that they had been opened

several years before 2013.

Second, Defendant stored various chemicals in a manner inconsistent with their use in

laboratory operations.  For example, Defendant stored certain chemicals in file cabinets, on their

sides, or in a non-operational refrigerator.  Another container that was labeled ether anhydrous—

a chemical listed on the Government's Bill of Particulars[127]—was stored in a loft space above the

Beta Chem facility.  The manner in which Defendant stored these chemicals suggests that he did

not intend to use them in his operations, and thus they were being stored in lieu of being

disposed of.

Additionally, approximately 20 chemicals on the Government's Bill of Particulars tested

positive for radiation contamination according to Lemon's report, and all of the wipe samples

from containers Lemon analyzed tested positive for contamination.[128]  Even in a non-

contaminated state, the resale value of these chemicals would have been low.  But as a practical

matter, and as a result of KDHE orders prohibiting removal of contaminated materials from the

facility without prior approval, Defendant could not have reused or resold these chemicals in

their contaminated state.  Ultimately, to bring his laboratory back into working condition,

Defendant would have been required to dispose of chemicals contaminated by radiation that

could not be decontaminated.[129]  Rather than proceeding with a decontamination and disposal

plan, Defendant retained these contaminated chemicals at the Beta Chem facility.

---

[126]*See supra* Part II at 25–26 nn. 65–71.

[127]Doc. 52-3.

[128]Doc. 52-2; Doc. 69-2.

[129]Ex. 32 at 4 (2007 Consent Agreement requiring Beta Chem to submit a decontamination plan that would include "[a] description of the methods for disposal and documentation of radioactive waste.").

Finally, as explained above, the Court finds that operations at Beta Chem had ceased by the period identified in the Indictment.[130] By 2012, Defendant had made his final purchase of chemicals, and neighboring tenants did not see indications that he was working in the Beta Chem facility. Beginning in 2011, he employed Phillips to help him begin a new venture in "something completely different" than his previous operations. Specifically, Defendant expressed an interest in creating natural soaps, and Phillips researched various formulas for these soaps. Thus, by 2012, Defendant was not operating his laboratory or using the chemicals at issue in synthesis of radiological isotopes.

Certainly, Defendant expressed interest in regaining his radiation materials license leading up to and continuing through the period identified in the Indictment. And he made some initial efforts to consult with firms that could help him decontaminate the Beta Chem facility. But Defendant never carried out this decontamination process, so the initial KDHE Emergency Order remained in place and prevented Defendant from using or selling the chemicals in his laboratory. Thus, by 2012, Beta Chem had become a "defunct" operation,[131] and the hazardous chemicals at the facility were being stored there in lieu of being disposed of through a decommissioning and decontamination process. Therefore, the Court finds beyond a reasonable doubt that hazardous chemicals stored at Beta Chem during the period from March 2012 through October 2013 were "solid waste."

### 3. Element Three: Defendant's Knowledge of Chemicals' Hazardous Properties

A RCRA conviction also requires that the defendant knew the stored waste was "hazardous."[132] The Court finds that this element is satisfied beyond a reasonable doubt.

---

[130]*See supra* Part II at 28–31.

[131]*See* Ex. 812 at 6; Ex. 98 at 1.

[132]42 U.S.C. § 6928(d)(2)(A).

Defendant had an advanced degree in chemistry, and therefore he had knowledge of the hazardous properties of chemicals. As an example of this knowledge, Defendant stored certain chemicals with low flashpoints in a refrigerator, which is a widely accepted laboratory safety practice. In 2006, Snowden, a RCRA compliance officer with the EPA, explained certain RCRA regulations to Defendant and identified hazardous waste codes for various chemicals in the Beta Chem facility. Furthermore, many—if not all—of the hazardous chemicals stored at Beta Chem were labeled with pictograms that identified them as hazardous. Based on these findings, the Court concludes that Defendant was aware of the hazardous nature of the wastes stored at Beta Chem.

### 4. Defendant's Arguments Regarding Weight Requirement

Defendant argues that the Government must satisfy an additional element to obtain a conviction, that is, that Defendant stored more than 55 pounds of hazardous waste at the facility. Defendant points to a statement by Snowden in 2006 that Defendant should "never accumulate more than 55 pounds of hazardous waste at the facility."[133] Defendant argues this statement created a 55-pound threshold that needed to be reached before he would be considered in violation of RCRA.[134] But Snowden stated that if Defendant surpassed the 55-pound limit, he would be considered a "Kansas Generator" subject to additional labeling, storage, and training requirements under RCRA.[135] Snowden never stated that Defendant would avoid a RCRA violation by storing less than 55 pounds of hazardous waste at the facility. He simply stated that Defendant would be subject to additional requirements under the statute if he surpassed the 55-

---

[133]Ex. 87 at 4.

[134]*See* Doc. 69 at 7, 15 ("The cumulative weight attached to the items on List #2 does not exceed the 55-pound limit established by the EPA's own communication to Mr. El-Sherif.").

[135]Ex. 87 at 4.

pound limit.  Furthermore, Defendant has pointed to no legal authority that suggests that RCRA carries a 55-pound threshold that must be met before a defendant can be convicted for improper storage of hazardous waste.  Accordingly, the Court finds that the Government was not required to prove that Defendant stored more than 55 pounds of hazardous waste from 2012 to 2013.

Even if the Government was required to prove that Defendant stored more than 55 pounds of hazardous waste at the Beta Chem facility, the Court finds that this element was satisfied.  The cumulative weight of the wastes listed on Attachment 2 to the Government's Bill of Particulars is 44.27 pounds.[136]  The cumulative weight of the P-listed and U-listed wastes on Attachment 3 to the Government's Bill of Particulars is 158.97.[137]  As explained above, the Court gives full consideration to the weights associated with Attachment 3 to the Government's Bill of Particulars.[138]  Thus, the total weight of hazardous wastes is more than 200 pounds, well above the 55-pound threshold that Defendant promotes.

The Court concludes that the Government has proved the elements of the Count 1 RCRA hazardous waste charge beyond a reasonable doubt.  The Court finds that Defendant knowingly stored hazardous waste at the Beta Chem facility from March 2012 through October 2013 without a permit to store such waste under RCRA.  Accordingly, the Court finds Defendant guilty of Count 1.

### B.      Count 2: Obstruction of Agency Proceeding Charge

Defendant is charged with obstructing an agency proceeding in violation of 18 U.S.C. § 1505.  Section 1505 provides criminal penalties for "[w]hoever corruptly . . . influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper

---

[136]Tr. 1036:7–1038:5, 1039:1–1040:6.

[137]Tr. 1040:12–1041:1.

[138]*See supra* III.A.1 at 36.

administration of the law under which any pending proceeding is being had before any department or agency of the United States."[139]  Thus, a conviction on Count 2 requires proof beyond a reasonable doubt that (1) on or about January 2015, a proceeding was pending before a department or agency of the United States; (2) Defendant knew that a proceeding was pending before a department or agency of the United States; and (3) Defendant corruptly endeavored to influence, obstruct, or impede the due and proper administration of the law in that proceeding.[140]

The first two elements of this analysis are not in issue.  The Government proved beyond a reasonable doubt that an agency proceeding was pending in January 2015 before an agency of the United States, and that Defendant knew of this proceeding.  That is, Defendant knew of the ability to pay inquiry that the EPA was pursuing during this time.  Thus, the remaining question is whether Defendant corruptly endeavored "to impede the due and proper administration of the law" during the ATP proceeding.[141]

The term "corruptly" as used in section 1505 means "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information."[142]  The Supreme Court has held that the term "endeavor" includes "any effort or essay to accomplish the evil purpose that the section was enacted to prevent."[143]  The obstruction need not be successful to constitute a § 1505 violation; "an endeavor suffices."[144]

---

[139] 18 U.S.C. § 1505.

[140] *Id.*; Doc. 69 at 10 (Defendant listing elements of Count 2 charge); Doc. 70 at 60 (Government listing elements of Count 2 charge).

[141] 18 U.S.C. § 1505.

[142] 18 U.S.C. § 1515(b).

[143] *Osborn v. United States*, 385 U.S. 323, 333 (1966) (internal quotations omitted).

[144] *United States v. Erickson*, 561 F.3d 1150, 1160 (10th Cir. 2009).

Although the obstruction need not be successful, the Supreme Court has adopted a "natural and probable effect" requirement in the context of 18 U.S.C. § 1503, an obstruction statute nearly identical to § 1505.[145]  Under this standard, the "endeavor must have the natural and probable effect of interfering with the due administration of justice."[146]  Several courts have applied the "natural and probable effect" requirement in the § 1505 context, and the Court will do the same because of the similarities between § 1503 and § 1505.[147]

Defendant cites *United States v. Wood*,[148] in which the Tenth Circuit applied the "natural and probable effect" standard in a case involving a charge of obstruction of justice under § 1503.[149]  The defendant in *Wood* made false statements to FBI agents about a car he had loaned to the chairman of the Navajo Nation of Indians during the course of an investigation the agents were conducting into political corruption involving the chairman.[150]  The government later learned that the statements were false, but did not further investigate the facts involved in the statements.[151]  In upholding the District Court's dismissal of the obstruction charge, the Tenth Circuit found that the FBI agents did not rely exclusively on the defendant's false statements and terminate their investigation, but instead continued to investigate the case and revealed the truth

---

[145]*United States v. Aguilar*, 515 U.S. 593, 599 (1995) (explaining that "the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice" to form the basis of a conviction under 18 U.S.C. § 1503 for obstruction of justice).

[146]*Erickson*, 561 F.3d at 1159 (quoting *Aguilar*, 515 U.S. at 599); *United States v. Wood*, 6 F.3d 692, 695 (10th Cir. 1993) (quoting *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990)).

[147]*See United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002) (applying "natural and probable effect" standard in context of § 1505); *United States v. Jacques Dessange, Inc.*, 4 F. App'x 59, 63 (2d Cir. 2001) (assuming that "natural and probable effect" standard applies to § 1505 prosecutions); *United States v. Perraud*, 672 F. Supp. 2d 1328, 1342–43 (S.D. Fla. 2009) (applying "natural and probable effect" analysis in § 1505 case).  *But see United States v. Bhagat*, 436 F.3d 1140, 1147–48 (9th Cir. 2006) (holding that "natural and probable effect" standard applied in *Aguilar* does not apply in § 1505 context).

[148]6 F.3d 692 (10th Cir. 1993).

[149]*Id.* at 695–96 (citing *United States v. Thomas*, 916 F.2d 647, 651 (11th Cir. 1990)).

[150]*Id.* at 693–94.

[151]*Id.* at 694.

about the car.[152]  The court thus concluded that the false statements "did not have the natural and probable effect of impeding the due administration of justice in the sense required by 18 U.S.C. § 1503."[153]

Defendant argues that as in *Wood*, any false statements in the tax returns here did not have the natural and probable effect of impeding the ATP proceeding because the EPA did not rely on the inaccurate information in Defendant's corporate tax returns in evaluating his ability to pay.  The Court agrees.  The evidence at trial tended to show that Defendant submitted post hoc corporate tax returns to the IRS in November 2014 after he was made aware that the IRS did not have tax returns on file for Beta Chem for tax years 2010, 2012, and 2013.  Certain figures on these corporate tax returns are irreconcilable with those reflected on Defendant's personal tax returns for the same years.  The Government, however, did not present evidence suggesting that the figures on Defendant's personal tax returns are false or inaccurate.

Even assuming the figures on Defendant's corporate income tax returns are false, the Court finds that these figures did not have the natural and probable effect of obstructing the EPA's inquiry.  Jacob Nicholls testified that he was aware the IRS did not have tax returns for Beta Chem on file in November 2014 for tax years 2010, 2012, and 2013, and he was also aware of the discrepancies between the corporate and personal tax returns when he was conducting the ATP analysis.  Nicholls did not follow up with Defendant or his counsel to gain additional information about these discrepancies.  Instead, he used the information contained on Defendant's personal returns, and ignored the figures on the corporate returns because he was

---

[152]*Id.* at 696–97.

[153]*Id.* at 697.

not focused on Beta Chem's ability to pay. As in *Wood*, the EPA did not rely on the false statements in the corporate returns in conducting its inquiry.

Certainly, as Nicholls testified, false statements contained on the corporate tax returns would give the EPA reason to question the truth of figures contained on Defendant's personal tax returns.[154] But the Government presented no evidence that the EPA further investigated the figures on Defendant's personal tax returns based on the discrepancies it knew existed between the corporate and personal returns, and there was no evidence that the information in Defendant's personal returns was inaccurate. The Court therefore finds that obstruction of the ATP proceeding was not a natural and probable effect of the inconsistent information contained in Beta Chem's corporate tax returns. Accordingly, the Court finds Defendant not guilty of the Count 2 obstruction charge.

## IV.     Conclusion

Based on the above stated findings of fact and conclusions of law, the Court finds that Defendant is adjudged guilty of Count 1, in violation of 42 U.S.C. § 6928(d)(2)(A), and not guilty of Count 2. The Court orders that a Presentence Investigation Report be prepared and that the Clerk set the case for sentencing.

**IT IS SO ORDERED.**

Dated: July 26, 2018

<div style="margin-left:40%">

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

</div>

---

[154]Tr. at 1118:1–21, 1121:14–1123:7, 1150:25–1152:3.